## Shattuck *versus* Haworth.

1. The word "fraud," as used in the 33d section of the Bankrupt Law of 1867, means positive fraud or fraud in fact.

2. S., with the money and for the account of H., purchased certain oil certificates, which were to be delivered to H. upon payment of storage charges. Under the instruction of H. the oil and the certificates were several times transferred, accordingly as the market rose or fell. It was the custom of the trade, in their dealing with oil and certificates, that the parties intrusted therewith should have absolute control of the capital used, and in pursuance of this custom the money or certificates were deposited in bank by S. in his own name. H. directed S. to sell one certificate and loan three, and the money realized from the sale and as security for the certificates was thus deposited as usual. The bank failed, and after demand, H. sued S. in trover for the certificates. S. pleaded his discharge in bankruptcy, which the court overruled. *Held*, that this was error; that S. was guilty neither of the actual fraud contemplated by the 33d section of the Bankrupt Law nor even of constructive fraud.

October 23d 1879. Before Sharswood, C. J., Mercur, Gordon, Paxson, Trunkey and Sterrett, JJ. Green, J., absent.

Error to the Court of Common Pleas of *Venango county*: Of October and November Term 1879, No. 59.

Trover and conversion, by John W. Haworth against L. L. Shattuck, for four oil certificates.

The material facts were these:

In the years 1876 and 1877, Richard L. Irwin and Leander L. Shattuck were engaged in buying and selling petroleum for third persons, for a commission, and in taking charge of petroleum for other persons, to transact such business as might be necessary relative thereto, and among other things for the purpose of paying storage, called by the trade "freshening." The actual oil was not in their possession, but it was represented by accepted orders of pipe-line companies. In the language of the petroleum trade they were known as "oil brokers." On the 2d of February 1877, John W. Haworth delivered to Irwin, a United Pipe-Line accepted order calling for one thousand barrels of crude petroleum, and received a receipt for the same, signed by Irwin, in the firm-name of Shattuck & Irwin, specifying that the firm held the certificate for Haworth, and agreeing to deliver the same to him on demand upon the payment by Haworth of the storage that Shattuck & Irwin might advance for him. On the 27th of February 1877, Haworth delivered to Shattuck similar accepted orders for two thousand barrels of petroleum, in addition to the one thousand previously given, and received a similar receipt, signed by Shattuck, by the firm-name of Shattuck & Irwin. Irwin lived in Pleasantville, six miles from Titusville, and Shattuck lived in the latter place, and had the active

10 Norris—29

[Shattuck *v.* Haworth.]

management of the business. Irwin sent to his partner, Shattuck, the certificate for one thousand barrels, so that Shattuck had in his possession the three certificates, representing three thousand barrels of crude petroleum. On the 16th of June 1877, Haworth sent to Shattuck, at Titusville, in a letter, still another accepted order for one thousand barrels of petroleum, and in the letter instructed him to loan all the certificates he had in his hands for the purpose of saving fire loss and storage charges. By other letters Haworth had theretofore, instructed Shattuck to sell his certificates in the manner known in the jargon of the trade as "spot," and to make contracts for future delivery of the same amount of oil, so sold, known as "seller's options."

Among other letters were the following:

"Pleasantville, Pa., June 14th.

Major Shattuck:

Buy me from three to five thousand options buyers the year any place from $2 to $2.10. Howard offered them yesterday less, and if spot should run up to $2 sell against them, or if it goes to 95, if you think it is going back, sell at 95; use your own judgment; but I think it is a good time to take some options, unless there is something new struck at Bullion, then it would be better to sell spot. If you get me some options, and spot should run up so you could cover even the 95, do the best you can, just as if you was doing for yourself, and no reflections.

Yours respectfully,

J. W. H."

"Pleasantville, Pa., June 16th.

Major:

I wish you would loan out whatever certificates you may have of mine, and also this one I send you. I am afraid of fire. Loan them subject to your call, if spot runs up a little I will sell them. I have not heard anything from you for a few days about options. Bumstead told me that they were offered at Oil City the day I told you to buy them at 8¾ and 10c. I wish you would try to get me some at $2.10, or thereabouts. Post me whenever you hear anything.

J. H. W."

As the holders of the certificates were required to pay the storage charges and fire loss assessments made by the pipe-lines according to the system of general average, Haworth instructed them to loan the certificates for the purpose of avoiding the charges and assessments, which they accordingly did, taking as security for them the prevailing price in money at the time of the loan, and these moneys and all others realized by them out of these transactions, which were chiefly managed by Shattuck, were by him placed in bank in his own name.

On June 14th, in pursuance of the instructions of the letter of that date, Shattuck sold one of Haworth's certificates as spot oil against outstanding options, at the same time selling some of his own in the same manner. What Haworth's portion sold for was not specified, but it was included in $11,021 deposited by Shattuck on that date in the Exchange Bank. And following the instruction of the letter of June 16th, he loaned the remaining three certificates on June 20th, reserving as security for the loan, $4625. This money he deposited on June 21st in the Exchange Bank. These deposits were as usual in his own name. The bank failed, and on June 22d its doors were not opened, nor has it since resumed. On that day, Haworth demanded his oil, and in answer Shattuck informed him of the facts, and that the money was in the Exchange Bank. Subsequently, in answer to Haworth's inquiries, Shattuck informed him that he had placed the money in bank to his own credit, and the oil also. Thereupon Haworth sued the firm in trover to recover the certificates, and Irwin dying pending the suit, proceeded against Shattuck alone.

At the trial the defendant offered to prove "that Irwin had an arrangement with the Pleasantville Bank for a credit there on account of this business, by which money was to be deposited there subject to check on account of the business of Shattuck & Irwin, and the circumstance the plaintiff relies upon, that the money was deposited to an overdrawn account, would amount to nothing, because they had money there at Pleasantville."

The court rejected the offer.

"The defendant offered to follow the evidence already in, and in connection therewith, with evidence that said money was deposited in the Exchange Bank of Titusville, in his own name, according to the custom of trade and the course of business with the plaintiff, known to him, and in such transactions the plaintiff became and is indebted to him and the estate of his deceased copartner in about the sum of $500."

Plaintiff objected to so much of said offer as proposes to prove a custom of trade for brokers to deposit money of their principals in their own name.

By the court:—We reject so much of the offer as includes the offer to prove a custom of brokers to deposit money of their principals in their own name, especially as in this case it appears that the money—as appears by the testimony of the defendant—that the money he had deposited—the proceeds of the plaintiff's oil, was deposited to his own credit to an overdrawn account.

The plaintiff submitted the following point, which the court affirmed:—

If the jury believe that Shattuck, acting as broker or agent for Haworth, took the certificates in controversy belonging to Haworth, and loaned or sold them without disclosing that they were not his

[Shattuck *v.* Haworth.]

own property, but dealing with them as his own, and deposited the money received for them to his own account in bank, the said account being at the same time overdrawn, this was a conversion of said certificates to defendant's use, and he is liable to plaintiff for the value of them, as of the date of said conversion with interest.

The defendant submitted the following points :

1. If the jury believe from the evidence that the plaintiff, on or about June 16th 1877, instructed the defendant to loan three of the·oil certificates referred to in the declaration, and sell the other pursuant to instructions, and the defendant did loan and sell them in accordance with the custom of the trade, and received the sum of about $6525 as security for said loans and for said sale, which sum he deposited on the day of its receipt, to wit, June 21st 1877, in the Exchange Bank of Titusville, and the said Exchange Bank failed on the 21st day of June 1877, and did not open its doors for business on that day nor since, these facts did not constitute a conversion of said certificates by the defendant, and the plaintiff cannot recover in this action.

2. If the jury find from the evidence that the defendant followed the instructions of the plaintiff and loaned and sold the oil certificates referred to in the declaration, and received money therefor, which he deposited in the Exchange Bank, this action cannot be sustained.

3. If the jury believe from the evidence that for several months prior to June 22d 1877, the defendant had been buying, selling and loaning oil certificates for the plaintiff, and transacting the incidental business connected with these acts in his own name, and that this was known to the plaintiff; and that on or about the 21st day of June 1877, the defendant, in pursuance of instructions from the plaintiff, loaned and sold the pipe-line oil certificates, and received the sum of about $6525 as security for said loan and for said sale, and deposited the same in the Exchange Bank of Titusville, and that on the day of said deposit defendant had an arrangement with said bank by which he had deposited collateral security with it, and that his checks were to be honored until notice from the bank to the contrary ; and should also find that the Exchange Bank failed and closed its doors the next day after such deposit, and the defendant never received any part of the money he had deposited, and did not deposit it with the intention of paying his own debt, even though the account was overdrawn, and the collateral not sufficient to cover such overdraft, then there is no evidence of actual fraud, and the defendant's discharge in bankruptcy is a complete bar to this action, and the verdict must be for the defendant.

These three points the court answered as follows :—

" These points assume as proven facts and theories deduced from such facts, of which there is no sufficient evidence to submit to the

[Shattuck *v.* Haworth.]

jury, and the other statements therein contained, while true, do not contain the whole truth, as conceded by both parties from the evidence.   The court declines to answer the above stated three points as requested."

In the general charge, the court, inter alia, charged:—

"But really, we will say to you that the developments in the case show Shattuck not to be a broker in any legitimate sense of that word; he is a mere speculator.   In this case he was not a broker in this transaction in any legitimate sense of the term.   I do not know what the other brokers in this Exchange are, whether they are entitled to the name of brokers or are mere speculators with their own money or the money of other persons, and cannot bring themselves within any legitimate definition of brokers or claim any of the ordinary rights of brokers. * * *

"A broker, when he undertakes to act for another, ought to disclose the name of his principal, or disclose if he is acting in the capacity of a broker, agent or factor. * * *

"We say to you, if you believe the evidence as detailed by witness, and in one sense of the word there is not very much discrepancy between the testimony of the parties, except as to the authority; if you believe that evidence, Shattuck is guilty of conversion of this property to his own use. * * *

"One portion of the evidence, that tends to show that it was a conversion, and a fraudulent conversion in fact, was in taking the proceeds and paying his own debt with it to the Exchange Bank. * * *

"Now it is alleged on the part of the defence, that although this account was overdrawn $7000, he still had credit with the bank. It does not appear in evidence that Shattuck had the right to draw to an unlimited amount upon that bank, or rather to draw checks till the bank told him to stop.   Hoag said they had collateral for his overdrafts, and he could get any collateral he had that exceeded his overdraft; but it nowhere appears, if the court understands the testimony, that he was authorized to overdraw any collaterals he had there. * * *

"Now it is also alleged that Mr. Shattuck was simply doing what was the custom of the trade, that he not only did that, but that he was authorized by Haworth to sell or to loan.   There is a letter in evidence of the 16th June 1877.   It looks towards an authorization on the part of Haworth to loan.   But it seems to have been an authorization to loan for Mr. Haworth, and if the defendant loans for himself or uses the proceeds for himself, it is still a conversion because he has not followed the instructions, and as to the failure of this bank, causing this loss or causing a failure upon the part of Shattuck to repay or to recompense Haworth his loss, or for the non-return or non-delivery of the oil certificates, we fail to see how that affects the question at

[Shattuck *v.* Haworth.]

all, because at the time the bank failed Shattuck was still overdrawn some $7000 and the collaterals were insufficient to pay it." * * *

"If you believe the evidence of Haworth and Merrick, sufficient demand was made to authorize the bringing of this suit." * * *

"Now you will recollect Haworth and Merrick both testified. Haworth himself testified on the day of the failure of the bank he asked Shattuck for his oil certificates; Shattuck put him off from time to time. He says he asked for them three times and when the news of the failure of the bank came Shattuck said he had loaned three thousand and one thousand still remained in the bank. I believe he afterwards told Merrick so. That is all, however, for you, and it tends to show the *mala fides* of this defendant. * * *

"We have it that he received about $2500 from the officers of the bank; whether to keep quiet or not we do not know; he received $2500 as his share of the margin on the advance of oil after the overdraft had been paid. There was certainly then $2500 of the proceeds of the plaintiff's own oil that he received which he had failed to account for these oil certificates, enough, to say nothing of what he was to be accountable for, growing out of the transaction; after all these occurrences he receives $2500 which was the legitimate proceeds of Haworth's loan."

Verdict for plaintiff for $7279.73, when defendant took this writ, and alleged that the court erred in rejecting the above testimony; in the answers to the foregoing points, and the portions of the charge above set forth.

*Roger Sherman* and *C. Heydrick,* for plaintiff in error.—A factor with unlimited powers to sell and loan accepted pipe-line orders for oil of his principal, for money, in the manner customary in the business, and according to his own judgment, who does sell and loan them in the manner directed, cannot be held to have wrongfully converted the property into money: Cooley on Torts 442, 448, 449, 450; Everett *v.* Coffin et al., 6 Wendell 604; Sargeant *v.* Blunt, 16 Johns. 73; Dufresne *v.* Hutchinson, 3 Taunt. 117; Jenner *v.* Joliffe, 6 Johns. 9; Lockwood *v.* Bull, 1 Cowen 322; Etter *v.* Bailey, 8 Barr 442; Wagenblast *v.* McKean, 2 Grant 393; Bunting *v.* Dessau, 9 Phila. R. 31.

Whether defendant was a factor or a broker he was clearly entitled to show that the custom of those doing the business he was engaged in, was to deposit the money received for their principals, and buy and sell without disclosing the names of said principals.

The Bankrupt Act expressly provides for a discharge from a debt or obligation growing out of the taking and converting of goods by the debtor. It makes no difference, therefore, that the plaintiff below brought an action of trover. The form of action determines

nothing, and we must look only at the character of the debt. We contend there was no evidence of actual fraud, and nothing from which an inference of fraud could lawfully be drawn: Chapman v. Forsythe, 2 Howard 202; Grover & Baker v. Clinton, 8 Nat. Bank Reg. 312; Cronan v. Cotting, 104 Mass. 245; Neal v. Clark, 5 Otto 704; Hennequin v. Clews, 19 Albany Law Jour. 477.

*Dodd & Lee*, for defendant in error.—It is true the certificates were properly in the possession of Shattuck, and that he was authorized to loan them for Haworth, but when he disposed of them for his own benefit, or deposited them as collateral for his own debt, he made a wrongful and unauthorized conversion of them. Trover will lie for certificates: Neiler et al. v. Kelley, 19 P. F. Smith 403; Norlin v. Kidder, 54 Me. 187; Graves v. Smith, 14 Wis. 5; Coffin v. Anderson, 4 Black. 395; Hart v. Skinner, 16 Vt. 138; Tallman v. Turck, 26 Barb. 167.

Clearly Shattuck's discharge in bankruptcy did not release him from liability on this claim. Bankruptcy is no bar to an action of trover: Hughes v. Oliver, 8 Barr 426. "No debt created by fraud or embezzlement of the bankrupt, or while acting in any fiduciary character, shall be discharged," is the plain language of the act.

Mr. Justice GORDON delivered the opinion of the court, November 10th 1879.

In the case of Neal v. Clark, 5 Otto 704, it is ruled, "That the word 'fraud,' as used in the 33d section of the Bankrupt Law of 1867, which provides that, 'no debt created by the fraud or embezzlement of the bankrupt, or by defalcation of a public officer, or while acting in a fiduciary capacity, shall be discharged under this act,' means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without bad faith or immorality."

Applying this rule to the case in hand, we are obliged to disagree with the court below in overruling the defendant's plea of a discharge in bankruptcy. There is, so far as we can see, no evidence of an intentional fraud, a design to cheat the plaintiff out of the proceeds of his oil certificates. The head and front of Shattuck's alleged offending is, that he deposited the certificates in bank, to his own instead of Haworth's credit, and so, as it is said, converted them to his own use. This, however, was only a question of *how* he should have conducted the business with which he was intrusted. The plaintiff alleges that the certificates and their proceeds should have been deposited to his credit; not that there was any contract so to do; not that Haworth directed that it should be so done, but because the character of the agency was such that legally the business should have been so conducted. Admit that

[Shattuck *v.* Haworth.]

this statement of the case is correct, and that Shattuck's act in depositing the certificates to his own credit, or that of his firm, was a violation of a legal duty, it by no means follows, as the learned judge alleges, that this, of itself, constituted a fraud in fact, for it may have been intended only as a convenient method of disposing of the business he had in hand, or it may have resulted in an ignorance of his duty, and in either of the cases supposed, though it might constitute a legal or constructive fraud, it would not constitute an actual fraud, or fraud in fact, such as comes within the 33d section of the Bankrupt Act.

But we cannot see how, legitimately, the question even of constructive fraud is raised from the evidence in this case. There was a loss, to be sure, but it resulted from no evil intent or action of Shattuck, but from the breaking of the bank, and we cannot understand how the plaintiff would have been benefited had the money and certificates stood on the bank's books in his own name; at best it was but water spilled upon the ground, it could not be gathered again; it was lost, but lost by the fault of neither of the parties contestant.

Looking then at the evidence what do we find? The purchase by Shattuck & Irwin of certain oil certificates for the plaintiff, and which they agreed to hold for him and deliver to him on demand. So far as we can learn these certificates were never passed by endorsement, or otherwise, to Haworth, but remained in the possession and power of Shattuck & Irwin.

They were negotiable; made so by the Act of May 15th 1874. Hence the meaning of this transaction was that this company should use this paper as to them might seem proper, and upon demand made by the plaintiff, deliver to him, not these identical certificates, but certificates of a similar character and amount. If, then, this is the true meaning of the contract, it follows, of course, that if this paper was deposited in bank at all it must go to the credit of Shattuck & Irwin, for if it was indorsed to Haworth, and passed to his credit, that would be a delivery and an end of the contract between the parties. This, however, was not designed. For if Shattuck was a speculator so also was Haworth; he did not buy this oil for the purposes of trade, but to sell, and, with its proceeds, buy again as the market might rise and fall; it was in this way he intended to make money upon his investment. But in order to do this he must have some person who was engaged in the business to handle his capital for him; for this reason he did not take a transfer of the certificates sold to him by Shattuck & Irwin, but allowed them to remain in their hands. In pursuance of this same design, he writes to the defendant under date of April 5th, * * * "Buy me two thousand; use your own judgment. * * * Keep me posted and buy one or two when you think best, and no reflections." So on the 16th of the same month: "Every body seems to think

its going lower, so we will work on small margins; sell then; when it drops 5c., pick up." Again, on the 8th of June: "I think it a good time to get options. * * * You keep watch of them, and when you think she has struck the bottom, get me some." Also, June 14th: "Buy me from three to five thousand options, buyers, this year, any place from $2 to $2.10. * * * if spot should run up to $2, sell against them, or, if it goes to 95, if you think it is going back, sell at 95; use your own judgment; but think it is a good time to take some options, unless there is something new struck at Bullion, then it would be better to sell spot. If you get me some options, and spot should run up so you could cover even the 95, do the best you can, just as if you was doing for yourself, and no reflections."

Again, June 16th, some five days before the Exchange Bank closed, he writes: "I wish you would loan out whatever certificates you may have of mine and also this one I send you. I am afraid of fire. Loan them subject to your call; if spot runs up a little I will sell them." From the above it is manifest that the power of the defendant was most ample to sell, buy and loan; all of which he did. The plaintiff's capital, upon which this business was founded, was three thousand barrel certificates of the United Pipe-Line, mentioned in the receipts of Shattuck & Irwin of February 25th and 27th 1877. But in order to obey the instructions above written, if the defendant were to buy options, to sell in orders to cover, or meet, these options, to loan subject to his own call, he must have the absolute control of the certificates and of the money realized from them. For the plaintiff to say to Shattuck, sell, buy, loan on your own call and on your own judgment, and at the same time to expect that the certificates and money, hypothecated for the loans, should go into bank to the credit of himself, the plaintiff, involves ideas so utterly inconsistent with the ordinary rules governing such business as to be incredible.

As we have said before, had the original certificates been endorsed over to the plaintiff, that would have been an end of Shattuck's power, and it would have been vain to have told him to sell that over which he had no control. Just so with the loans, the character of which Haworth seems to have well understood, for he says: "I understood if the broker loaned certificates and took the money at the market price, by tendering this money, he could redeem the certificates," and in the same connection he says Shattuck told him he had loaned his certificates at $1.53. Now, if the defendant was not to retain this money in his own name, to have it in such a shape that he could draw on it when the certificates were to be redeemed, why direct him to loan subject to his own call? His call without the money to give it force would certainly not be an effectual one. And this matter the plaintiff understood just as well as any one else. He says, in answer to the question: "What do

[Shattuck *v.* Haworth.]

you suppose he did with the money when he loaned your certificates?" "I suppose he took care of it; probably put it in the bank; never asked him anything; he never told me he put it into the bank to my credit; I told him to be careful of my certificates and not lose them or their proceeds." And again; to the question: "When he had money to pay, how did you suppose he got that money?" "I supposed when he would sell he would have some money again, and when he would buy again he would buy with that money." Nothing more than this is necessary; it is an epitome of the whole transaction. Shattuck was to buy and sell, use the property and money, as in his own transactions, and account to Haworth for the final proceeds. His orders from his principal were: "*Do the best you can, just as if you were doing for yourself, and no reflections.*" So it turns out that so far from Shattuck's having committed an actual, intentional fraud, such as would deprive him of the benefit of his certificate in bankruptcy, he has not even committed a constructive one. When the bank closed and shut out both him and the plaintiff, he was just where he had previously been; in the full discharge of the duties imposed upon him by his contract with the plaintiff.

Judgment reversed, and a new *venire* ordered.